IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| v. | * | Case No. 25-cr-20032 |
| SANJEEV KUMAR, | * | |
| Defendant. | * | |

---

## DEFENDANT'S RENEWED MOTION FOR MISTRIAL

---

Defendant Dr. Sanjeev Kumar, by and through undersigned counsel, respectfully moves this Court for an order declaring a mistrial due to the Government's repeated violations of its constitutional disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) (requiring prosecution to turn over material exculpatory evidence to defense), and *Giglio v. United States*, 405 U.S. 150 (1972) (extending *Brady* to evidence that contains relevant impeachment evidence), as well as its statutory and rule-based obligations under the Jencks Act, 18 U.S.C. § 3500, Federal Rule of Criminal Procedure 26.2, and Federal Rule of Criminal Procedure 16. "[U]nder *Brady* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment." *Strickler v. Greene*, 527 U.S. 263, 288 (1999). The Government has a duty to "evaluate evidence" in its possession to comply with *Brady* obligations. *Jamison v. Collins*, 291 F.3d 380, 387 (6th Cir. 2002), *as amended on denial of reh'g* (July 11, 2002).

The jury has been charged but has not been discharged, and no verdict has been returned. The record now reflects a pattern of preventable discovery violations and material misrepresentations that has irreparably prejudiced Dr. Kumar's right to a fair trial and effective

cross-examination. Defendant therefore moves for a mistrial and states in support of his motion as follows:

## I.    BACKGROUND

On April 16, 2024, a search warrant was executed at the Poplar Avenue Clinic ("PAC"). Prior to and after the search warrant, Dr. Kumar received administrative investigative demands from the agencies involved in this criminal matter. The Grand Jury returned an Indictment against Dr. Kumar on February 27, 2025, and he was arrested the following day. (ECF Nos 1, 8.) Beginning from around the time the search warrant was executed at PAC in 2024, the Government had been interviewing witnesses for purposes of its investigation and this trial.

On March 3, 2025, the Court entered an order requiring the Government to produce all exculpatory evidence to Dr. Kumar pursuant to *Brady*, 373 U.S. at 83, and its progeny. (ECF No. 10.) The Court warned that "[f]ailing to do so in a timely manner may result in consequences, including, but not limited to, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, or sanctions by the Court." (*Id.*)

Defense counsel requested *Brady* and *Giglio* disclosures from the Government in writing on March 19, 2025. (ECF No. 26.) Defense counsel again requested *Brady* and *Giglio* disclosures from the Government during the pre-recorded video deposition of Emily Sells on November 20, 2025, which occurred prior to trial.[1] During the deposition, defense counsel became aware that the Government had been meeting with its witnesses prior to trial but was not recording witness preparation memorandums. Defense counsel stated on the record that it was concerned those memorandums contained constitutionally discoverable material that was not being turned over to

---

[1] The deposition of Mrs. Sells has not yet been played for the jury and thus is not part of the record as of the date of this filing, though the Government intends to play the deposition for the jury prior to the close of its case-in-chief.

defense counsel and reminded the Government of its constitutional discovery obligations. Further, during trial, defense counsel has continued to request *Brady* and *Giglio* materials from the Government.

In just two weeks of trial, the Defense has identified a growing pattern of discovery, *Brady*, and Jencks violations, which cumulatively and individually undermine confidence in the fairness of these proceedings.

The Government's problematic conduct began at the outset of the case when the United States Attorney's Office for the Western District of Tennessee publicly called Dr. Kumar "a predator in a white coat" in a press release and pursued inflammatory sexual-abuse allegations that were later dismissed. Despite retraction of those comments, the publicity was not corrected in the same manner, and those dismissed allegations remain posted by the Department of Justice. Nearly every member of the venire appeared aware of the press; several prospective jurors expressed distress—even in tears—about serving. The Defense sought to explore their feelings individually outside the panel but was prevented from doing so.

As the trial progressed, the proof showed that the Government's public allegations about "unsanitary" conditions were not backed by forensic testing, and that its "unnecessary procedures" theory rested on an expert's personal views of medical practice rather than empirical support. The Government also publicly alleged that Dr. Kumar performed a procedure on a fourteen-year-old girl—an allegation the evidence at trial has not supported.

This ends-justify-the-means approach has now culminated in repeated discovery violations, including the withholding of exculpatory and impeachment material from a key cooperating witness's phone until after her testimony, delayed production of agent reports and witness statements, and the use of an inaccurate summary and incomplete testing claims.

3

### A.  Huda (Alaeddin) Hussein

Huda (Alaeddin) Hussein is a Physician Assistant who worked at Poplar Avenue Clinic from its opening in 2019 through November 2022.  Both Mrs. Hussein and other witnesses testified that she was actively involved in the operation and day-to-day management of PAC.  Marlea Boyd, another physician's assistant, testified that she was confused about who her boss was at PAC (either Dr. Kumar or Mrs. Hussein) due to Mrs. Hussein's significant role in the clinic and providing instruction to other employees.

The issue of Mrs. Hussein's phone arose when the Government attempted to offer into evidence screenshots of her WhatsApp messages with Dr. Kumar.  Defense counsel raised that Mrs. Hussein had deleted messages from WhatsApp and thus did not provide the full set of messages to the Government.  Defense counsel objected to the entry of the messages on this basis, arguing that Mrs. Hussein provided the Government with only a curated set of messages.  Mrs. Hussein was questioned about deleting the messages during her cross-examination, to which she largely testified that she could not recall whether she deleted anything.

The Government issued Mrs. Hussein a target letter on May 15, 2024, notifying her that she was the target of a federal investigation.  Mrs. Hussein engaged in a proffer session with the Government on May 30, 2024.  Her attorney, Mike Scholl, appeared before the Court on December 12, 2025.  He stated that during the proffer interview, in lieu of a search warrant for Mrs. Hussein's phone, Mrs. Hussein agreed to turn over her phone to the Government.  Mr. Scholl stated that there were no limitations provided to the Government regarding their review of Mrs. Hussein's phone, though the conversation at that time primarily related to WhatsApp messages.  The Government agreed to review Mrs. Hussein's phone for only communications related to Poplar Avenue Clinic, not purely personal matters.  Though Mr. Scholl stated that Mrs. Hussein provided her entire phone

to the Government, an FBI report states that, on May 31, 2024, and June 25, 2024, Mrs. Hussein provided documentation of her communications with Dr. Kumar to the Federal Bureau of Investigation.

Mrs. Hussein testified that in or around August of 2025, she used a link to download all of her WhatsApp messages with Dr. Kumar. The Government produced a transcript of Dr. Kumar and Mrs. Hussein's WhatsApp messages on July 3, 2025.[2]

Mrs. Hussein testified that, approximately one month prior to trial, she again provided her phone to the Government so that investigators could take screenshots from her phone. Mrs. Hussein testified that she did not limit the Government's scope or use of her phone. On cross examination, Mrs. Hussein testified that she recovered and went through considerable effort to obtain her old phone number and to reinstate her WhatsApp messages, that she gave her phone to investigators without restriction, and that written communications related to her practice at PAC were not deleted and would be on the phone along with messages with other PAC employees.

Cross examination revealed that her phone contained exculpatory material. During cross-examination, Mrs. Hussein admitted that she sent text messages to Dr. Kumar's wife demanding $50,000 or she would cause reputational harm to Dr. Kumar and his wife. She also acknowledged that she made statements to multiple agencies—including the Tennessee Attorney General's office, the Medical Board, the FBI, and HHS-OIG—and that her statements changed over time.

At sidebar conferences related to the messages admitted into evidence, the Government took shifting positions regarding its possession and access to Mrs. Hussein's phone, arguing at various points that it did not have access, did not have authority to review the messages, and that the defense was on a fishing expedition.

---

[2] USA-0090859–USA-0091886.

5

The Government stated that it was provided with Mrs. Hussein's phone, took the screenshots it needed of Mrs. Hussein's phone, and then could no longer access the phone because it was password protected. Counsel also stated, however, that Mrs. Hussein told the Government to keep her phone so they could access it again if more trial exhibits were needed. Even though the Government states that they did not possess the passcode, there has been no explanation of why they did not have access to it given that Mrs. Hussein was cooperating with the Government, she turned over her phone without limitation, that she intended for the Government to be able to access her phone again, and that the Government had the ability to contact her directly if needed to obtain the passcode. The Government kept the phone through trial. The Court ordered that the phone be returned to Mrs. Hussein after her testimony on December 11, 2025. The Court also denied the Defendant's oral motion for a mistrial.

After trial recessed that day, the Government e-mailed Defense counsel at approximately 10:00 p.m. and stated that, the following day (December 12, 2025), it would produce a flash drive created by Mrs. Hussein on July 4, 2024, and provided to the Government prior to trial. In transmitting that production, AUSA Lynn Crum wrote: "As part of the WhatsApp upload, there were numerous explicit photos and miscellaneous material, none of which is exculpatory." The contents of the flash drive were different in some respects than what the Government represented. The flash drive contains text messages, WhatsApp messages, and emails—including exculpatory and impeaching materials. The flash drive includes, among other things, photographs of reusable instruments (a camera head and multiple graspers), which reflects Mrs. Hussein's knowledge that reuseable devices were used at PAC during her tenure, and what appears to be a Facebook message conversation between Mrs. Hussein and another provider in which Mrs. Hussein states that the provider should refer a patient without insurance and a complicated medical issue to Dr. Kumar,

undermining Mrs. Hussein's testimony that Dr. Kumar was profit-minded.  Further, when the defense objected at trial to the introduction of messages between Dr. Kumar and Mrs. Hussein that were sexual in nature, the Government strongly argued that those messages were relevant to this matter because Mrs. Hussein was coerced by Dr. Kumar to commit the acts charged in the Indictment.  Defense counsel countered that those messages were not relevant and that Dr. Kumar did not coerce Mrs. Hussein.  The flash drive production includes an e-mail between Dr. Kumar and Mrs. Hussein in which he gives her several options about whether to stay at PAC and putting that decision in her hands. The Government did not correct the record when Mrs. Hussein gave testimony contradicted by these records.

The phone is back in the hands of a cooperating witness who could face perjury allegations if messages on that phone conflict with her trial testimony.  Further, at this point in the trial, multiple PAC employees who worked at the clinic at the same time as Mrs. Hussein have already testified.  This includes Dr. Adio Abdu, Shams Akel, Marlea Boyd, Julianna Cox, Kendall Sacahrczyk, Emily Sells, and Paige Theuer.  Mrs. Hussein testified that she exchanged written communications with PAC employees that would be on the phone in the Government's possession. Dr. Kumar does not have an opportunity to re-cross-examine those witnesses.

### B.  Drew Moore

Drew Moore testified during the Government's case-in-chief.  During his testimony, Mr. Moore described communications with PAC personnel and offered opinions about possible device reuse. He was a key government witness because he was intimately familiar with the devices sold and the condition of the devices.

After Mr. Moore testified, on December 9, 2025, the Government disclosed a report that it classified as Jencks material for another one of its witnesses, Special Agent Brian Kriplean of the

Food and Drug Administration. The report appears to be a log of Special Agent Kriplean's investigative activities in this matter through at least September 21, 2025. The report includes a memo of a conversation Special Agent Kriplean had with Mr. Moore on April 23, 2024. During that conversation, Mr. Moore offered to place an undercover call to Poplar Avenue Clinic on behalf of the Government. On some other unspecified date, Mr. Moore stated he felt uncomfortable placing an undercover call. These conversations were not disclosed to Dr. Kumar prior to Mr. Moore's testimony but rather after he testified.

The defense was deprived of the opportunity to investigate and use this material to impeach Mr. Moore's credibility and bias, and to cross-examine him effectively regarding his involvement and relationship with the investigative team. The jury heard his testimony and likely credited it without the important bias challenge that could have been raised by a witness in a highly regulated industry agreeing to cooperate with the FDA. The Court ordered the Government to reproduce Mr. Moore as a witness in Dr. Kumar's case-in-chief at the Government's expense.

### C.  Harley (Brim) Collier

Harley (Brim) Collier was a Physician Assistant at PAC from July 2022 through approximately September 2023. She was interviewed by the Government on August 19, 2025. The Government failed to disclose prior to trial exculpatory statements made by Mrs. Collier during that interview, including that she did not think "there were unnecessary procedures conducted by KUMAR and other providers at PAC because KUMAR is meticulous about missing cancer" and that, in relation to the use of devices at PAC, she "was not told to do anything for a profit." Those statements are exculpatory to the health care fraud charges based on medical necessity and the felony counts of adulteration and misbranding charged against Dr. Kumar. Further, those statements directly bear on the Government's theories and the credibility of its witnesses.

8

After Mrs. Collier's direct examination, defense counsel requested Jencks material for Mrs. Collier and further stated the request was being made because an interview report for this witness had not been produced to the Government. Counsel for the Government stated that there was an interview report for Mrs. Collier that it believed to have been produced. Upon further review, the Government concluded the report had not been produced. Defense counsel was given approximately an hour to review the report, during which the Court ruled on objections related to exhibits for Mrs. Hussein. The Court did not provide sufficient time for Defendant to review and make effective use of that report before continuing examination. The late disclosure and the denial of time to review impaired the defense's ability to confront the witness with her prior statements and to investigate the report's contents in real time or utilize the report to obtain additional evidence.

### D. Thomas Lawson

The Government introduced a summary prepared by Thomas Lawson, regulatory affairs for UroViu, to suggest that after the search warrant Dr. Kumar purchased a significant amount of single-use devices immediately thereafter—supporting a theory that Dr. Kumar changed practices because he knew his prior conduct was improper. During cross examination, it was revealed that the summary was inaccurate and was contradicted by invoices.

Mr. Lawson was apparently disturbed by his testimony and wrote an email to Special Agent Brian Kriplean immediately after leaving the witness stand. While the Government produced this correspondence after it received it, it did not produce other email correspondence, text messages and additional communication between Lawson and Special Agent Kriplean. It was on notice of a relationship between Special Agent Kriplean and Mr. Lawson.

Nearly a week later, the Government produced an email from Mr. Lawson showing that he

contacted Special Agent Kriplean and ostensibly requested permission to distribute additional devices to Dr. Kumar in April 2024. The email was exculpatory because it was an inaccurate assertion—"after not ordering any single-use cannulae for over a year…"—which is significant impeachment material. After a review of the email during trial on Friday, December 13th, both the Government and the Court described the testimony as not exculpatory. This assertion highlights the error inherent in the Court and Government's analysis of what constitutes exculpatory material. The email was in fact exculpatory because it contained an inaccurate statement—in fact Dr. Kumar's practice ordered numerous devices between March 2023 and April 2024 and most of them were to replace units that were repeatedly broken—a defense theme—Dr. Kumar did not utilize these devices frequently because while the technology was appreciated it was error prone and less adequate than his preferred hysteroscope: the Olympus.

The email is also exculpatory because it shows the FDA's reliance on faulty invoicing data obtained by Mr. Lawson that was part of the genesis of the case. The Government asserted during opening and the testimony of Mrs. Hussein that Dr. Kumar did not have a sufficient number of devices compared to the number of procedures he conducted. In support of this contention, it introduced a demonstrably inaccurate summary that was rebutted during Mr. Lawson's cross. The delayed disclosure of the related correspondence severely prejudiced the defense and undermined the integrity of the factfinding process because defense counsel could not show the jury that Mr. Lawson informed Special Agent Kriplean of faulty ordering data during the beginning of the investigation.

Moreover, it appears that due to UroViu seeking permission to distribute devices it must have received permission because devices were shipped. It is unthinkable that an FDA regulated entity would ship devices to an entity known to reuse them. Indeed, Mr. Lawson testified that he

would not have authorized shipment to a company he knew was misusing his devices. Thus, it is

likely that Special Agent Kriplean authorized UroViu devices to be shipped to Dr. Kumar after

allegations that he had reused single use devices. The FDA authorizing the distribution of devices

to an entity for which there was apparent probable cause to search due to misbranding is a

substantial indication that Special Agent Kriplean intended to feed the Government's theory that

Dr. Kumar knows he is guilty because he changed his practices after the search warrant—a central

government theory.

### E.  Paige (Gorst) Theuer

Paige (Gorst) Theuer was interviewed on April 29, 2024, by Special Agent Reagan Ann

Fajkus of the Federal Bureau of Investigation and Special Agent Brian Kriplean of the Food and

Drug Administration.  The interview report for that meeting was produced to Defendant on April

2, 2025.  The interview report states:

> In reference to the scope in the picture, GORST commented, "we
> don't really use those anymore." PAC stopped using the handheld
> devices with the scope attachment around the summer of 2023. PAC
> switched to using the towers for hysteroscopies.

Mrs. Theuer testified on December 4, 2025.  Her testimony at trial contradicted her

statement in that report.  On her direct examination, the following testimony was elicited from the

witness:

> Q. Okay. And prior to April 16th of 2024, were you using this device
> to conduct hysteroscopies with biopsies, this tower?
>
> A. Yes, I had used it before.
>
> Q. Okay. Did you still use the one with the black monitor, the
> handheld with the black monitor fairly regularly at that time, as
> well?
>
> A. At times, yeah.

11

(Testimony of Paige Theuer, ECF No. 204, at PageID 2053.)

After her direct examination, defense counsel objected to the untimely disclosure of Mrs. Theuer's contradictory testimony. Defense counsel asked for an opportunity to recess to address this issue and another issue related to Mrs. Theuer's testimony about Dr. Kumar's state of mind and her opinion that he did not want to incriminate himself. The Court denied that request.

On cross examination, Defense counsel confirmed and clarified Mrs. Theuer's testimony:

> Q. Ms. Theuer, on your direct examination, you said that in 2024, handheld devices were used at the clinic, correct?
>
> A. Yes.
>
> Q. And that's your testimony today that handheld devices were used at the clinic?
>
> A. They were available to use, yes.
>
> Q. So is it your testimony that they were used or they weren't used?
>
> A. They were used still in 2024.

(Testimony of Paige Theuer, ECF No. 211, at PageID 2392–93.) The questioning continued to inquire about when and whether Mrs. Theuer relayed that statement to agents during her interviews in April 2024, in June 2025, and in November 2025. Mrs. Theuer testified that she relayed that Poplar Avenue Clinic continued to use handheld devices in 2024 to the prosecution team during her interviews with them. (*Id.* at PageID 2398–2402.) The change in testimony—that is, that PAC continued to use handheld devices after the summer of 2023—was not disclosed by the Government to Dr. Kumar in discovery. The Defense became aware of that change in testimony only during Mrs. Theuer's direct examination. The disclosure of that statement to Defendant would have impacted the defense's trial strategy.

12

### F. The Government's Patten of Discovery Violations and Misrepresentations

In the first two weeks of trial, the Government has engaged in a pattern of violations:

1. Failure to notify the Defense that the Government possessed Mrs. Hussein's phone and had unrestricted access to it. The Government stated to the Court that Mrs. Hussein's consent to search was limited, when sworn testimony from Mrs. Hussein and her counsel established that consent was not limited.

2. Failure to timely disclose text messages, WhatsApp messages, screenshots, and emails produced by Mrs. Hussein during her proffer and cooperation, including the July 4, 2024, flash drive produced after her testimony.

3. Failure to seek out and disclose exculpatory material in Mrs. Hussein's phone in the Government's possession, including material favorable to Dr. Kumar and impeachment material bearing on Mrs. Hussein's credibility and bias, or (at a minimum) notify Defense counsel that it possessed the phone.

4. Selective use of the contents of Mrs. Hussein's phone at trial while withholding exculpatory evidence from the Defense.

5. Failure to disclose exculpatory statements by Mrs. Collier, including statements that she did not believe that Dr. Kumar conducted unnecessary procedures or used devices for a profit.

6. Failure of Special Agent Brian Kriplean to timely produce email correspondence with Mr. Lawson (UroViu) containing a statement related to a contested issue at trial ("after not ordering any single-use cannulae for over a year…") and related correspondence requested by and material to the defense.

7. Failure to provide to the defense, prior to Mr. Moore's cross examination, the substance of Mr. Moore's conversation with Special Agent Kriplean in which Mr. Moore offered to place consensually recorded/undercover calls to Dr. Kumar.

8. Offering into evidence a misleading summary during the testimony of Mr. Lawson that was clearly contradicted by invoices.

9. Failure to timely produce the investigative log of Special Agent Brian Kriplean, which includes notes of his interview with Mr. Moore when he offered to place consensually recorded/undercover calls to Dr. Kumar.

10. Failure to disclose purported "preliminary blood results" obtained by Special Agent Kriplean. Special Agent Miller testified that Special Agent Kriplean informed him of positive blood results on devices seized by the FDA.

11. Failure to disclose Mrs. Theuer's contradictory statement that single-use devices continued

13

to be used at PAC in 2024.

12. Counsel for the Government admitted that counsel missed a pre-trial meeting to review Special Agent Kriplean's computer and only conducted that review during the second week of trial; the Government's review of discoverable *Brady* and Jencks material was not completed until Friday, December 12, 2025, after two weeks of trial.

The defense contends the following was also in error:

1. Permitting the Government to return the phone to Mrs. Hussein—a cooperating Government witness—after her testimony.

2. Denying the request for recess during Mrs. Hussein's cross examination to permit inspection of the phone after her testimony established she consented to a search and placed no restrictions on access.

3. Denying the request for recess to review an exculpatory report produced after Mrs. Collier's direct examination.

## II.    LAW & ARGUMENT

The Governments' failure to uphold its discovery obligations has irreparably prejudiced Dr. Kumar's ability to investigate the charges against him, prepare for trial, and effectively cross-examine the Government's witnesses.

A defendant is constitutionally entitled to three categories of evidence: (1) *Brady*, which requires the "Government to disclose evidence that is favorable to the accused and material to guilt or sentencing, as well as evidence that could be used to impeach the credibility of a government witness,"; (2) evidence covered, upon request, under Federal Rule of Criminal Procedure 16; and (3) Jencks Act material (statements of witnesses who the government will have testify).  *United States v. Bell*, No. 16-cr-20460, 2019 WL 76868, at *2 (E.D. Mich. Jul. 31, 2019).

### A.  The Jencks Act and Rule 26.2

Federal Rule of Criminal Procedure 16(a)(2) prohibits "the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500" (the Jencks Act). The Jencks Act allows the Government to withhold prior statements of its

witnesses until after the Government offers their testimony at trial.  18 U.S.C. § 3500.  The

Government's *Brady* and *Giglio* obligations trump the Jencks Act and Rule 16(a)(2), and require

pretrial disclosure of exculpatory and impeachment material when necessary for its effective use.

*United States v. Presser*, 844 F.2d 1275, 1280–84 (6th Cir. 1988); *United States v. Hayes*, 376 F.

Supp. 2d 736, 738–39 (E.D. Mich. 2005).

The Jencks Act defines a "statement" as: "(1) a written statement made by [a government]

witness and signed or otherwise adopted or approved by [the witness]"; (2) a recording or

transcription of "a substantially verbatim recital of an oral statement made by [a government]

witness and recorded contemporaneously with the making of such oral statement"; or (3) a

statement made by a government witness to a grand jury, however taken or recorded, or a

transcription thereof. 18 U.S.C. § 3500(e); *see also* Fed. R. Crim. P. 26.2(a), (f).

The Jencks Act and Rule 26.2 thus require production of official reports prepared by

government agents and experts who testify at trial. When Jencks material is produced so late that

the defense cannot effectively review and use it, the refusal to grant a reasonable continuance is

reversible error. *See United States v. Holmes*, 722 F.2d 37, 40–41 (4th Cir. 1983) (reversing

conviction and granting new trial where continuance denied after Jencks material—"a stack of

paper at least eight inches thick"—was provided the day before trial). To alleviate lengthy delays

and promote efficiency, it is the better practice for the Government to agree to disclosure of Jencks

materials at a reasonable time before trial. *See United States v. Lewis*, 35 F.3d 148, 151 (4th Cir.

1994); *United States v. Minsky*, 963 F.2d 870, 876 (6th Cir. 1992)

Under the Jencks Act, if the Government "elects not to comply" with an order directing it

to deliver a witness's statement to the defendant, the Court must strike the witness's testimony

from the record or declare a mistrial "if the interests of justice" so dictate. 18 U.S.C. § 3500(d).

When bad faith is established, sanctions are appropriate. *See United States v. Kasouris*, 474 F.2d 689, 692 (5th Cir. 1973) (declaring mistrial when prosecutor represented to court that he possessed no Jencks material for a witness when he had a signed statement in his file); *United States v. Mannarino*, 850 F. Supp. 57, 66 (D. Mass. 1994) (ordering new trial when agent's misconduct resulted in the witness destroying Jencks material); *see also United States v. Ramirez*, 174 F.3d 584, 588 (5th Cir. 1999) (remanding for hearing where Jencks material was erased; bad faith would require dismissal).

### B.  The Government's Constitutional Duty to Disclose and Correct

The prosecutor in a criminal case must disclose to the defendant all exculpatory material. *Brady*, 373 U.S. at 87. Brady's due process rule applies "irrespective of the good faith or bad faith of the prosecution." *Id*. *Brady* also requires disclosure of evidence impeaching a Government witness when the reliability of that witness may be determinative of guilt or innocence. *Giglio*, 405 U.S. at 153–55. The purpose of *Brady* is to ensure that a "miscarriage of justice" does not result from the suppression of evidence favorable to the accused.   *United States v. Bagley*, 473 U.S. 667, 675 (1985). Courts must focus on the fairness of the trial, not on the Government's intent. *See Walker v. Lockhart*, 763 F.2d 942, 957 (8th Cir. 1985) ("It is irrelevant whether the State acted in good faith or bad faith in failing to disclose the evidence; negligent suppression may be sufficient.").

"A successful *Brady* claim requires a three-part showing: (1) that the evidence in question be favorable; (2) that the state suppressed the relevant evidence, either purposefully or inadvertently; (3) and that the state's actions resulted in prejudice." *Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010) (quoting *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008)).   Whether evidence "is favorable is a question of substance, not degree, and evidence that has any

16

impeachment value is, by definition, favorable." *United States v. Cloud*, 590 F. Supp. 3d 1364, 1370 (E.D. Wash. 2022) (citing *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015)); *see also Robinson*, 592 F.3d at 735 (encompassing both evidence that directly supports the defendant's innocence and evidence that can be used to undermine the credibility of prosecution witnesses). Regarding the second prong, "*Brady* requires that the prosecution disclose all exculpatory and impeachment evidence that is in the government's ***possession***." *United States v. Smith*, 749 F.3d 465, 492 (6th Cir. 2014) (emphasis added); *Jamison*, 291 F.3d at 387 (noting Government has a duty to "evaluate evidence" in its possession to comply with *Brady* obligations) ; *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984) (noting the prosecution cannot avoid *Brady* "by keeping itself in ignorance, or compartmentalizing information about different aspects of a case"). Finally, suppression is material if evidence is not provided "in time for its effective use at trial" and where there's a reasonable likelihood it affected the judgment of the jury. *United States v. Mills*, No. 16-cr-20460, 2019 WL 549171, at *3 (E.D. Mich. Feb. 12, 2019); *see also United States v. McClellon*, 260 F. Supp. 3d 880, 884 (E.D. Mich. 2017) ("Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." (quoting *Wearry v. Cain*, 577 U.S. 385, 392 (2016)).   "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (noting analysis is not a "sufficiency of the evidence" test).

### C. The suppression of exculpatory and impeachment evidence, late Jencks disclosures, and presentation of misleading evidence require a mistrial.

*Brady* and *Giglio* require disclosure of exculpatory and impeachment material "in time for its effective use at trial." *Mills*, 2019 WL 549171, at *3 (citing *Presser*, 844 F.2d at 1283). Here, the Government repeatedly disclosed material only after the relevant witness testified—or after

the defense had been forced to cross-examine without the benefit of the evidence—thereby depriving Dr. Kumar of meaningful cross-examination and investigation. *See Giglio*, 405 U.S. at 154; *Robinson*, 592 F.3d at 735.

The Government's conduct surrounding Mrs. Hussein is emblematic. The Government possessed her phone with no limitations and obtained screenshots for trial exhibits, while simultaneously representing that it lacked access or authority to review the contents and characterizing defense requests as a fishing expedition. The Government had a duty to "evaluate evidence" in its possession, including Mrs. Hussein's phone, to comply with its constitutional discovery obligations. *Jamison*, 291 F.3d 380 at 387 (6th Cir. 2002).

The Government's argument that it lacked access to Mrs. Hussein's phone because it did not have the passcode is misplaced. The Government must produce exculpatory and impeachment evidence in its possession, custody, or control. *United States v. Reid*, 20-CR-00626 (PMH), 2024 WL 2159848, at *8 (S.D.N.Y. May 13, 2024). Though the contents of an encrypted or locked device that the Government cannot access are not considered to be in the Government's possession, custody, or control, *see id.*, that is not the situation here. Mrs. Hussein provided the Government with unlimited access to her phone over one year ago during her proffer interview. The Government took possession of phone one month prior to trial—again without any limitation in access—to take screenshots of messages for trial. The phone was unlocked when provided to agents, and the agents decided to only take pictures of the things they needed. *Carey*, 738 F.2d at 878 (noting the prosecution cannot avoid *Brady* "by keeping itself in ignorance, or compartmentalizing information about different aspects of a case"). The Government had a duty to disclose, at the time it took possession of the phone, any exculpatory or impeachment information to the Defense because the phone was in its possession, custody, or control.

Further, the argument that the Government lacked the passcode to the phone for the past month also fails. Mrs. Hussein was cooperating. She left her phone with the Government so they could use it again as needed. The Government had unfettered access and only needed to call her for the code if it needed it. This is not the case of the Government possessing a phone from an individual who refuses to provide the code or provide the Government access. Rather, the Government had unlimited access, including to the entire WhatsApp messaging application.

The situation regarding Mrs. Hussein's phone is even more problematic considering that, after Mrs. Hussein testified, provided her phone, and the Court denied the Defendant's motion for a mistrial, the Government informed Defense counsel that, yet it again, it possessed material not disclosed to the Defense. After Mrs. Hussein testified and the defense had cross-examined her, the Government produced the July 4, 2024 flash drive—containing text messages, WhatsApp messages, and emails—including exculpatory and impeaching material. The Government's email describing the production as containing "numerous explicit photos and miscellaneous material, none of which is exculpatory," underscores the suppression and the defense's inability to prepare and confront Mrs. Hussein with those statements and documents. *See Strickler*, 527 U.S. at 288. The Government's failure to disclose and its failure to correct testimony contradicted by these records violates *Brady*. *See Brady*, 373 U.S. at 87.

To the extent there is any question that Mrs. Hussein's phone possessed exculpatory or impeachment material, Defense counsel entered into evidence messages that Mrs. Hussein sent to Dr. Kumar's wife, extorting his wife for money. Further, Mrs. Hussein testified that she communicated with PAC employees on her phone.

The Government's suppression was not confined to Mrs. Hussein. Special Agent Kriplean's investigative report—produced after Mr. Moore testified—contained impeachment

evidence that Mr. Moore offered to place an undercover call on behalf of the Government. The
defense was denied the ability to explore that relationship and bias in cross-examination. *See
Giglio*, 405 U.S. at 154.

The Government also withheld exculpatory statements from Mrs. Collier and then
produced an exculpatory report only after her direct examination, while the Court denied adequate
time to review it. The late production prevented effective use and impaired cross-examination. *See
Holmes*, 722 F.2d at 40–41; *Mills*, 2019 WL 549171, at *3.  Mrs. Collier's statements are material
to the charges against Dr. Kumar because they pertain to whether Dr. Kumar performed medically
unnecessary procedures or used devices for profit during her tenure at PAC.

Similarly, the Government failed to timely disclose that Mrs. Theuer would contradict her
April 2024 interview report regarding the use of handheld devices. The defense learned of that
change only during her direct examination, sought time to address it, and was denied. A changed
or inconsistent statement from an eyewitness or key witness is classic impeachment evidence, and
where that witness is critical, the materiality is heightened.  *See Smith v. Cain*, 132 S. Ct. 627, 76
(2012).[3]  Mrs. Theuer's testimony about the use of single-use devices by PAC in 2024 was critical
to the numerous adulteration and misbranding of single-use device charges against Dr. Kumar, all
charged as occurring on or about April 16, 2024.

Finally, the Government presented and relied upon an inaccurate summary through Mr.
Lawson and failed to timely disclose correspondence revealing the summary's inaccuracies and
other impeachment material.

---

[3] The Government's awareness of its discovery obligations to produce inconsistent
statements of witnesses regarding whether only reuseable scopes were used at PAC in 2024 is
reflected in its production of such an inconsistent statement of Gayla Cheatham in the few days
prior to her testimony.

Each of these violations independently undermines the fairness of the proceedings. Cumulatively, they render any verdict unworthy of confidence. *See Bagley*, 473 U.S. at 675; *Kyles*, 514 U.S. at 434, 441; *Pelullo*, 105 F.3d at 122; *Smith*, 77 F.3d at 512.

The pattern extends to Special Agent Kriplean's reports and purported testing. The defense learned mid-trial that Special Agent Kriplean had not timely produced an investigative report in his possession that documented witness contacts and investigative steps, including contact with witnesses who had already testified. The Government also failed to disclose purported "preliminary blood results" that Special Agent Miller testified were represented to him as positive. The absence of timely disclosure of test results and investigative reports—which bear directly on the Government's adulteration and misbranding theories—deprived the defense of the ability to investigate, consult experts, and cross-examine with the relevant material. *See Myatt v. United States*, 875 F.2d 8, 12 (1st Cir. 1989); *United States v. Serv. Deli Inc.*, 151 F.3d 938, 943 (9th Cir. 1998). That prejudice was compounded by the Government's admitted delay in reviewing Special Agent Kriplean's computer and investigative files until the second week of trial. *Carey*, 738 F.2d at 878.

## III.    CONCLUSION

For the foregoing reasons, Defendant Sanjeev Kumar respectfully requests that this Court enter an order declaring a mistrial for the Government's violations of its discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).

Respectfully Submitted,

s/ Lawrence J. Laurenzi
Lawrence J. Laurenzi (TN BPR No. 9529)
Elena R. Mosby (TN BPR No. 40562)
BURCH, PORTER & JOHNSON, PLLC

130 North Court Avenue
Memphis, TN 38103
901-524-5000
llaurenzi@bpjlaw.com
emosby@bpjlaw.com

Ronald Chapman, II (*pro hac*) (Mich. Bar No. P73179)
THE CHAPMAN FIRM
1300 Broadway
Detroit, MI 48226
Phone: (346) Chapman
Ron@chapmanandassociates.com

Maritsa A. Flaherty (*pro hac vice*) (Cal. Bar No. 327638)
CHAPMAN LAW GROUP
1441 W. Long Lake Rd., Suite 310
Troy, Michigan 48098
(248) 644-6323
mflaherty@chapmanlawgroup.com